Terry STASKAL and Teressa Staskal,
Plaintiffs-Respondents,

WAUSAU GENERAL INSURANCE COMPANY,
Subrogated-Plaintiff-Respondent,

v.

SYMONS CORPORATION, American International Specialty Lines Insurance Company and Evanston Insurance Company, Defendants-Appellants.†

Court of Appeals

*No. 2004AP663. Submitted on briefs May 23, 2005.
—Decided September 1, 2005.*

2005 WI App 216

(Also reported in 706 N.W.2d 311.)

† Petition to review dismissed 10-28-05.

511

513

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Lori M. Lubinsky, Axley, Brynelson, LLP*, Madison; *John W. Patton, Jr., Patton &*

*Ryan*, Chicago, Illinois; and *Edward M. Kay* and *Barbara I. Michaelides, Clausen Miller P.C.*, Chicago, Illinois.

On behalf of the plaintiffs-respondents, the cause was submitted on the briefs of *Daniel W. Hildebrand, Joseph A. Ranney,* and *Eric A. Farnsworth, DeWitt Ross & Stevens, S.C.*, Madison.

Before Vergeront, Deininger and Higginbotham, JJ.

¶ 1. VERGERONT, J. This action arises out of the collapse of two sections of concrete form work that occurred while concrete was being poured to form the fourth floor of the University of Wisconsin-Madison pharmacy building. Terry Staskal, a construction worker employed by the general contractor, Kraemer Brothers, LLC, was seriously injured. He and his wife sued the manufacturer of the concrete forming system, Symons Corporation and its insurers, seeking compensatory and punitive damages. The jury found both Kraemer and Symons causally negligent, apportioning 80% to Symons, and found Symons liable on the products liability claim. The jury awarded Staskal $8,821,610.13 in compensatory damages, $500,000 to his wife, and $15,000,000 punitive damages against Symons. Symons appeals, contending: (1) the circuit court erred in excluding the OSHA[1] report and related documents; (2) the compensatory damages were perverse and excessive; (3) there was insufficient evidence for the punitive damages claim to go to the jury; (4) the circuit court erred in its ruling on the admissibility of evidence of Symons's insurance coverage; (5) the amount of punitive damages is excessive and therefore

---

[1] OSHA stands for the Occupational Safety and Health Administration.

violates Symons's right to due process; and (6) Symons is entitled to a new trial under WIS. STAT. § 752.35 (2003–04).[2]

¶ 2. We conclude: (1) the circuit court properly exercised its discretion in excluding the OSHA report and related documents; (2) the award of compensatory damages is not perverse or excessive; (3) under the standard established in *Wischer v. Mitsubishi Heavy Industries America, Inc.*, 2005 WI 26, 279 Wis. 2d 4, 694 N.W.2d 320, and *Strenke v. Hogner*, 2005 WI 25, 279 Wis. 2d 52, 694 N.W.2d 296, the evidence was sufficient for the punitive damages claim to go to the jury; (4) the circuit court did not err in its ruling on Symons's insurance coverage; (5) the amount of punitive damages does not violate Symons's right to due process; and (6) we decline to award a new trial under WIS. STAT. § 752.35. Accordingly, we affirm.

## BACKGROUND

¶ 3. The concrete forming system manufactured by Symons consists of aluminum trusses supported by adjustable legs. Plywood and forms provided by the contractor are placed on top of the trusses to make a table upon which concrete is poured to form the floors. Symons provides the contractors with plans for the assembly and use of the system. Each floor is poured in sections between concrete columns that are cast before the floors are poured. After the concrete is hardened it becomes the foundation; the trusses are then "flown" by crane to the next level, where the process is repeated.

¶ 4. The standard adjustable leg specified for the system is composed of a single steel tube with a screw

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

jack at the bottom that has an 8"x10" base (standard base). The screw jack allows adjustment of the height of the leg up to a maximum of twelve feet. On this project, Symons specified two-piece legs in order to achieve a greater height—sixteen feet on the first three floors of the building and eighteen feet on the fourth floor. The two-piece legs consist of two pieces of steel tube joined by two screw jack-end plates bolted back to back. We will refer to the connecting assembly on the two-piece leg as the "knuckle."

¶ 5. The accident occurred when a section of the fourth floor collapsed while the cement for another section of that floor was being poured. Staskal was pinned under the rubble for three-and-a-quarter hours before being extricated. He sustained severe physical injuries and suffered post-traumatic stress syndrome.

¶ 6. The cause of the collapse was disputed at trial. Staskal's engineering expert, Dr. Howard Hill, testified that the accident occurred because the two-piece legs had inadequate capacity to carry the load of the system. The legs, he testified, did not provide anywhere near the capacity that the applicable minimum standards required. Dr. Hill opined that the legs needed bracing to give them adequate capacity, and he referred to Symons's engineering manual that showed both cross-bracing of the leg on the sides with two-inch by eight-inch elements and a wide-base jackstand, which has a larger base than the standard base as well as four support pieces. When bracing is needed to make the legs safe, Dr. Hill testified, it is a key structural element and must be included in the plans given the contractor, but it was not included in the plans given Kraemer. In Dr. Hill's opinion the two-piece legs without bracing was a defective design that was unreasonably dangerous, and in providing Kraemer these legs

without specifying adequate bracing, Symons's conduct did not meet the standard of care.

¶ 7. Symons's engineering expert, Dr. William Corley, agreed that the two-piece legs were not adequately braced, but he did not agree that caused the collapse. In his opinion the collapse was caused by changes Kraemer made in the configuration of the legs without Symons's approval, such that one leg was placed on an I-beam spanning a hole in the third floor. In Dr. Corley's opinion, Kraemer's failure to secure the leg to the beam to make sure it was centered on the beam and its failure to reinforce the beam's web (the vertical piece of the beam between the top and bottom horizontal pieces, which are called flanges) caused the beam web to bend and the leg to lose capacity, triggering the collapse.

## ANALYSIS

I. Exclusion of OSHA Report

¶ 8. Dr. Hsiang-Jen Yen of OSHA investigated the collapse. In his report he concluded that the following factors caused the collapse: Kraemer failed to properly brace the beam and the load was eccentrically placed; the top flange could not resist the applied load and slanted away from its horizontal position; and the leg slipped off the flange. OSHA cited Kraemer with four "serious" violations of the Occupational Safety and Health Act: requiring employees to walk under formwork while it was being loaded; inadequate protection from falls; changing Symons's plans without approval from a qualified designer; and use of the beam, which was not capable of supporting the maximum intended load. Kraemer contested the citations and eventually entered into a settlement agreement with OSHA. The

agreement eliminated the second and third violations, reduced the monetary penalties for the first and fourth violations, reclassified the fourth to an "other than serious" violation, and redefined the fourth violation without reference to the beam: "The . . . Form System, which was not designed by the employer [Kraemer] was not capable of supporting the maximum load at the floor opening of Column E6 on the third floor."

¶ 9. OSHA notified Symons "of the following hazards that the system designer would be responsible for" and recommended correction of them: (1) the legs used did not have the requisite safety factor in terms of load bearing, and (2) the two pieces used in the leg made plumbing not possible. However, this letter stated, OSHA was not issuing a citation for these hazards because there were no applicable OSHA standards and OSHA did not consider it appropriate to invoke the "general duty" clause of the statute.

¶ 10. Further investigation revealed that it was not the top flange but the bottom flange of the beam that was deformed. In Dr. Corley's opinion, this did not alter the validity of his theory that the collapse originated over the hole on the third floor because of Kraemer's misplacement of the leg on the I-beam and failures to secure the leg to the beam and reinforce the beam. In Dr. Hill's view, the fact that the bottom flange rather than the top flange was deformed supported his view that use of the beam was not a cause of the collapse.

¶ 11. Prior to trial, Staskal moved for a ruling that the OSHA report should be excluded. In his motion, Staskal pointed out that under federal law an OSHA investigator could not be called as a witness by private litigants; thus, Staskal could not cross-examine this investigator about the report. Staskal argued that the report was hearsay and the requirements of the

public report exception in Wɪs. Sᴛᴀᴛ. § 908.03(8) were not met. That statute provides:

> **(8)** Pᴜʙʟɪᴄ ʀᴇᴄᴏʀᴅs ᴀɴᴅ ʀᴇᴘᴏʀᴛs. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law, or (c) in civil cases and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Symons responded that the report was admissible under this hearsay exception and was also admissible under Wɪs. Sᴛᴀᴛ. § 907.03 because it was the type of data reasonably relied on by experts investigating industrial accidents in forming their opinions.

¶ 12. The court granted Staskal's motion, concluding that the report was not trustworthy for these reasons: it was based on an erroneous assumption about the beam; the amendment to the fourth violation in the settlement agreement suggested that there was a modification to OSHA's report; and no one from OSHA would be available at trial to answer questions about these uncertainties. For these same reasons, and because OSHA was investigating only Kraemer and not Symons, the court concluded that any relevance of the report was outweighed by the danger of confusion and unfair prejudice under Wɪs. Sᴛᴀᴛ. § 904.03.[3] In addition, the court reasoned, the report was cumulative because

---

[3] Wɪsᴄᴏɴsɪɴ Sᴛᴀᴛ. § 904.03 provides:

> **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

both parties had experts who were going to testify about causation and negligence. Finally, because the report was not going to be admitted, the court also excluded the OSHA letter to Symons, the citation sent to Kraemer and the settlement agreement, finding that they were all as "a package confusing," and, without an expert to explain them, likely to mislead the jury.

¶ 13. During trial, the court reaffirmed its reasoning for excluding the OSHA report in response to Symons's argument that Staskal's counsel had opened the door to its admission. It reaffirmed its reasoning again in denying Symons's motion after verdict raising this issue.

¶ 14. On appeal Symons contends the court erred in excluding the OSHA report for a number of reasons:[4] (1) the report, though hearsay, is trustworthy and thus meets the hearsay exception under WIS. STAT. § 908.03(8); (2) the court erred in excluding it for reasons of confusion, unfair prejudice, and cumulativeness under WIS. STAT. § 904.03; (3) even if the report is inadmissible hearsay, the court nonetheless erred in not permitting Symons to examine Dr. Corley and Dr. Hill on the report under WIS. STAT. § 907.03; and (4) Staskal's counsel "opened the door" to admission of the report after the court's ruling excluding it.[5]

---

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[4] Symons implicitly concedes that, if the OSHA report was properly excluded, the letter to Symons, the initial citation to Kraemer, and the settlement agreement were also properly excluded. Therefore we do not separately address these documents.

[5] Symons also argues that the circuit court's ruling excluding the report unfairly prevented it from showing that it voluntarily complied with the corrective action OSHA recom-

¶ 15. Generally, the decision whether to admit or exclude evidence is committed to the circuit court's discretion; we affirm discretionary decisions if the court applied the correct law to the facts of record and reached a reasonable result using a rational method. *Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. Applying this standard, we conclude the circuit court properly exercised its discretion in excluding the report and not permitting Symons to examine Dr. Corley or cross-examine Dr. Hill about it.

¶ 16. First, the court properly exercised its discretion in deciding the report did not meet the requirement in WIS. STAT. § 908.03(8) because it was not trustworthy. We disagree with Symons's contention that the court improperly treated the settlement agreement as evidence of the invalidity of the citation in violation of WIS. STAT. § 904.08, which provides:

> **Compromise and offers to compromise**. Evidence of furnishing or offering or promising to furnish, or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability

---

mended in its letter by telling its engineers not to use the two-piece leg. Staskal responds that Symons did not make this argument in the circuit court and in fact took the position there that the letter would show Symons ceased using the two-piece leg only because OSHA, in essence, made it do that. The record appears to bear this out and Symons does not dispute this assertion in its reply brief. We therefore do not address this argument. *See Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (proposition asserted by respondent and not disputed in appellant's reply brief is taken as admitted).

for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This section does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, proving accord and satisfaction, novation or release, or proving an effort to compromise or obstruct a criminal investigation or prosecution.

This statute has no applicability because the court did not admit the settlement agreement—for the purposes proscribed in the statute or for any purpose.

¶ 17. We also disagree with Symons's contention that the circuit court's assessment of the settlement agreement was unreasonable. According to Symons, the settlement agreement does not alter the fact that Kraemer was "cited for improperly supporting the framework over the hole in the third floor, the point where OSHA believes the collapse originated" and, thus, the settlement agreement does not make the report untrustworthy. We conclude that the court's reading of the settlement agreement—that it could mean that OSHA had changed its position on causation to include a problem with the two-piece leg system—is a reasonable one. It is not necessarily the only reasonable one, but the circuit court did not conclude that it was. Rather, the court reasonably viewed the settlement agreement as raising questions about the reliability of the conclusions in the report, and it took those questions into account in evaluating the trustworthiness of the report, along with the inability to ask the investigator these questions.

¶ 18. Regarding the admissibility of reports under the federal rule identical to Wis. Stat. § 908.03(8), a leading case has explained that among the factors rel-

evant to trustworthiness is whether the investigator held any kind of a hearing. *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 303 (11th Cir. 1989). The investigator here held no hearing. The *Hines* court explained that, with respect to OSHA reports in particular, the inability to call the investigator as a witness to cross-examine him or her about the report, *see* 29 C.F.R. §§ 2.20–2.25, was also a proper factor to take into account. *Hines*, 886 F.2d at 303–04. That factor cannot alone make a report untrustworthy, because the rule contemplates the unavailability of the declarant, but it is nonetheless proper to consider in deciding trustworthiness. *Id.* We find this analysis sound. We conclude the circuit court properly considered the lack of an opportunity to cross-examine the investigator or someone else knowledgeable about the modification to the citations.

¶ 19. Besides the uncertainty raised by the settlement agreement, the court considered the factual mistake made by the investigator to be relevant to the report's trustworthiness. This, too, was reasonable. There was no dispute that the bottom flange, not the top flange, was bent. Symons argues that, according to Dr. Corley, this did not undercut the conclusion the investigator reached, but Dr. Hill disagreed. In the absence of examination of the investigator on this point, there was no way to know whether his conclusions would have remained unchanged.

¶ 20. Second, because the circuit court reasonably concluded the report was not admissible under Wis. Stat. § 908.03(8), an analysis under Wis. Stat. § 904.03 is unnecessary. Section 904.03 provides a basis for excluding otherwise admissible testimony. In any event, the court's reasoning on confusing and unfair prejudice essentially tracked its reasoning on lack of trustworthi-

527

ness. The same factors that make it reasonable to consider the report untrustworthy make it reasonable to conclude that, in view of the settlement agreement and the factual error, the report is confusing and misleading to the jury. Similarly, the lack of opportunity to cross-examine the investigator or a knowledgeable witness about the modifications to the citations makes the initial report unfairly prejudicial to Staskal. The court's reasoning on the scope of OSHA's investigation was also sound. In its post-verdict ruling the court described this point as relatively minor compared to the others, but nonetheless as presenting a danger of confusion for the jury and unfair prejudice to Staskal: the jury might not understand that the citation of Kraemer, but not Symons, was the result of OSHA's view of its authority in this case.

¶ 21. The circuit court's discussion of cumulativeness, though not necessary, was also rational. By cumulativeness the court meant that there was other evidence of essentially the same theory of causation that was contained in the report. Symons's argument that there was no other evidence of OSHA's conclusion on causation ignores the court's reasonable view that it was no longer clear that the report accurately expressed OSHA's conclusion on causation.

¶ 22. Third, the court did not err in its analysis of WIS. STAT. § 907.03. That section provides:

> **Bases of opinion testimony by experts**. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by

experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Symons invoked § 907.03 in its brief opposing the motion in limine as a basis for admitting the report into evidence. However, as the circuit court correctly recognized—implicitly in granting Staskal's motion in limine and explicitly in its post-verdict rulings— § 907.03 is not a hearsay exception and does not make inadmissible hearsay admissible. *State v. Watson*, 227 Wis. 2d 167, 198–99, 595 N.W.2d 403 (1999). What § 907.03 *does* do is make an expert's opinion admissible even if the expert has relied on inadmissible hearsay in arriving at the opinion, as long as it is the type of facts or data reasonably relied on by experts in the particular field in forming opinions on the subject. *Watson*, 227 Wis. 2d at 195.

¶ 23. Symons does not direct us to any point in the record where the court did not allow Dr. Corley to express a particular opinion because he relied on the OSHA report in arriving at that opinion. Rather, it appears that what Symons wanted to do was ask Dr. Corley about the contents of the report.[6] In its post-verdict ruling, the circuit court aptly referred to this cautionary statement from *Watson*: "The danger in

[6] Symons does not direct us to any point in the record of the proceedings prior to or during the trial where it asked to be allowed to examine Dr. Corley on the OSHA report, without having it admitted into evidence, because it was a basis for his opinion. Thus, it is not clear that Symons properly preserved this issue for appeal. However, we decide the issue nonetheless because Symons raised it in its post-verdict motion, the circuit court addressed it then, and Symons refers to the OSHA report in its argument that we should use our discretionary powers of reversal under Wis. Stat. § 752.35.

permitting inadmissible hearsay to serve as the basis for expert opinions is that hearsay may reach the trier of fact through 'the back door' of cross-examination if experts are asked to explain the bases for their opinion." *Id.* at 199. For that reason, the court in *Watson* explained, a circuit court "must be given latitude to determine when the underlying hearsay may be permitted to reach the trier of fact through examination of the expert—with cautioning instructions for the trier of fact to head off misunderstanding—and when it must be rigorously excluded altogether." *Id.* at 200–01. The very factors that the court determined made the report untrustworthy under WIS. STAT. § 908.03(8) support the decision not to allow Dr. Corley to tell the jury about OSHA's report.

¶ 24. Moreover, the circuit court concluded, it was not even clear that Dr. Corley relied on the OSHA report in forming his opinion because his deposition testimony indicated he did not.[7] This is a sufficient basis, in itself, for not permitting Dr. Corley to testify about the report. The fact that Dr. Corley studied and analyzed the report, as Symons points out, does not mean that he relied on it in forming the opinions he presented at trial.

¶ 25. Symons's argument that the circuit court should have permitted Dr. Hill to be cross-examined about the OSHA report under WIS. STAT. § 907.03

---

[7] In his deposition, Corley testified, " . . .well, I didn't really rely on anything in the OSHA report, either, but I—whatever was there, I was aware of." He explained in his deposition that he accepted the orientation of the beam as stated in the OSHA report but then discovered that it was in error.

suffers from the same deficiencies.[8] Dr. Hill did not rely on the report in forming his opinion on the cause of the collapse. He reviewed it and in his own written report he explained at length why he disagreed with it. Dr. Hill's report was not admitted at trial and he did not mention the OSHA report at trial. There is no merit to Symons's argument that it nonetheless was entitled under § 907.03 to ask Dr. Hill about the OSHA report.

¶ 26. Fourth, the court's rulings during trial that Staskal had not "opened the door" to admission or further discussion of the OSHA report were reasonable. The court decided that Staskal's counsel's references to an investigation during opening argument did not indicate to the jury that there was an OSHA investigation. The record of the opening argument supports this as a rational decision.

¶ 27. Similarly, the court's refusal to alter its pretrial ruling during Dr. Corley's testimony was reasonable. Dr. Corley testified on direct that he initially accepted the orientation of the beam based on the report of another investigator, but that orientation was upside down. However, he testified, which side of the beam was up made no difference to the ability of the beam to resist the twisting. Symons's counsel objected to some questions on cross-examination as to why the orientation of the beam made no difference, again contending this was "opening the door" to the OSHA report. The court overruled the objections. On redirect, Dr. Corley testified without objection that the report from which he had originally obtained the information about the orientation of the beam was done right at the

---

[8] It is not apparent to us that this issue regarding Dr. Hill was properly preserved, but we address it nonetheless. *See* footnote 6.

time of the accident and the author of the report was an organization he would rely on in formulating opinions. He also testified that this same report had information about the table loads that he relied on in the early stages of his work until he obtained enough information to come up with his own loads. Given Dr. Corley's ability to explain that the mistaken assumptions came from another investigator and his consistent position that this made no difference to his opinion on what caused the collapse, the court could reasonably conclude that more detailed discussion of the OSHA report was not necessary for a fair presentation of Dr. Corley's opinion, in view of the problems with the report the court had already identified.

II. Compensatory Damages

¶ 28. The medical testimony on Staskal's injuries included the following. His legs were pinned beneath the fallen concrete, trusses, and beams for three hours and fifteen minutes while efforts were made to extricate him. Staskal was told by a doctor called to the scene that if those efforts did not succeed soon enough, in order to save his life both legs below the knee would have to be amputated, which itself could be a life-threatening procedure. Just before the point in time at which the doctor decided he would undertake the amputation, Staskal was freed. While Staskal was pinned under the rubble, his condition was too tenuous to permit the administration of pain medicines. Staskal was aware that either a failed rescue or an amputation could end his life.

¶ 29. Staskal had an open (compound) fracture of his left tibia (between the knee and the ankle) and his left femur (thigh bone), and an open fracture and dislocation of his right great toe, as well as a relatively

532

minor fracture to one of the bones in his right foot. The injuries to his left leg and right toe were crush injuries, meaning that the skin, muscle, and nerves around the bones were damaged as well. He was in the hospital from the date of the collapse, June 9, 1999, until July 2, 1999, undergoing numerous surgical procedures, including removing damaged skin and muscle, placing a plate in the tibia and a rod in the femur, amputation of his right great toe, and skin grafting. He was then in inpatient rehabilitation for two weeks followed by ten months of outpatient physical therapy. He had additional surgeries, including knee surgeries in 2000 and 2001, and, at the time of trial in October 2003, additional knee surgery was planned because of continued pain.

¶ 30. Staskal has braces on his feet and ankles for ambulation and will always need them. His permanent injuries include a 75% loss of use of his lower left leg as compared to amputation, and pain and limited motion of his knee. He has back pain from his limp and altered gait. Staskal's treating physician opined that there would unquestionably be a further deterioration in the function of his left knee and leg caused by his injuries and by the surgeries he has had; and it is very likely he will need future surgeries to help improve his functions. He also opined that Staskal, now middle-aged, is compensating reasonably well at this stage in his life, but as he ages his ability to compensate will go down; he is not going to get any better. Staskal's stipulated life expectancy is 32.6 years.

¶ 31. Staskal was diagnosed with post-traumatic stress syndrome as a result of the accident. His treating psychologist, who had seen him eighty-five times since November 1999, described his symptoms as including re-experiencing the accident in nightmares and disas-

sociative episodes; anger, irritability, and fear of the future that adversely affect his family relationships; and sleep disturbance. Since he began treating Staskal, there has been an improvement in the degree of Staskal's impairment. It is reasonably likely that Staskal will need to continue treatment for between three to five more years, with decreasing frequencies in the visits.

¶ 32. The vocational testimony was that Staskal cannot return to the trade of construction worker and he will be limited to light work. At the time of trial he was attending the University of Wisconsin in construction management and expected to graduate in the spring of 2004 with a degree in construction management. His vocational expert testified that he cannot perform the type of job in construction management that he could have done before the accident, but when he graduates he will have the capacity to perform some jobs in that field. Staskal's vocational expert opined that his future wage loss was $850,000; Symons's expert testified that it was $300,000–$400,000.

¶ 33. Staskal testified to his experience of having the concrete form work collapse on him, being conscious the entire time he was pinned under the rubble, and knowing he might die. He also described the pain during and following the initial hospitalization; the nightmares and flashbacks, which are less frequent but still occur; the physical activities he had enjoyed and can no longer do; the effect on his emotional health, marriage, and family relations; and his fears about deterioration of his condition in the future.

¶ 34. Symons's wife testified that she nursed and cared for her husband after the accident; she also testified to her own fears concerning his survival and recovery; the stress of witnessing his nightmares; and

the impact his pain and limitations have had on his relationship with her and their child and on their own well-being.

¶ 35. The jury returned a special verdict as follows: past medical expenses as stipulated by the parties—$254,851.23; future medical expenses, as stipulated by the parties—$194,799; past wage loss, as stipulated by the parties—$246,959.90; loss of future earning capacity —$625,000; past pain, suffering and disability—$1,500,000; future pain, suffering and disability—$6,000,000; loss of consortium for Staskal's wife—$500,000.

¶ 36. After the verdict, Symons moved for a new trial on compensatory damages on the ground that the verdict for loss of future earning capacity, past and future pain, suffering and disability and for loss of consortium was excessive and perverse; in the alternative, Symons asked for remittitur (a reduction in those damages). The court denied the motion. It concluded that, viewing the evidence most favorably to the verdict, the damage award was not perverse or excessive. The court stated that, while these amounts may have been greater than the court itself would have awarded, they did not shock the conscience. The court noted the unusual circumstances of Staskal being pinned while conscious under the rubble and the significant pain, fear, and expectancy of death that he experienced, as well as the resulting post-traumatic stress. The court also noted the substantial and permanent physical injuries, the permanent pain, the inability to return to his chosen employment, the testimony that he could no longer do most of the things he had enjoyed doing, and the testimony of an increase in his pain and disability in the future, noting that all of this testimony was uncontested. In the court's view, the jury had sorted through

the evidence and deliberated over it, as indicated by the fact that it did not give the higher awards the plaintiffs asked for.

¶ 37. On appeal, Symons renews its argument that it is entitled to a new trial or, in the alternative, to remittitur because the compensatory damages were excessive and perverse. Symons's challenge on appeal is confined to the damages for past and future pain, suffering and disability and for his wife's loss of consortium. For the alternative remedy of remittitur, Symons asks that these be reduced to the following: past pain, suffering and disability, from $1.5 million to $750,000; future pain, suffering and disability, from $6 million to $500,000; and loss of consortium, from $500,000 to $50,000.

¶ 38. A damage award is a matter resting largely within the discretion of the jury, and is to be upset only where it is so excessive as to indicate that it resulted from passion, prejudice, or corruption, or a disregard of the evidence or applicable rules of law. *Ballard v. Lumbermens Mut. Cas. Co.*, 33 Wis. 2d 601, 605–06, 148 N.W.2d 65 (1967) (citing *Kablitz v. Hoeft*, 25 Wis. 2d 518, 525, 131 N.W.2d 346 (1964)). When an award is excessive due to perversity, the defendant is entitled to a new trial. *Redepenning v. Dore*, 56 Wis. 2d 129, 134, 201 N.W.2d 580 (1972). An award is perverse "when the jury clearly refuses to follow the direction or instruction of the trial court upon a point of law, or where the verdict reflects highly emotional, inflammatory or immaterial considerations, or an obvious prejudgment with no attempt to be fair." *Id.* (footnote omitted). When a verdict is excessive, not due to perversity or prejudice or circuit court error, the plaintiff is granted the choice of either remitting the excess over the sum the court determines is reasonable

536

or having a new trial on damages. *Id.* at 133 (citation omitted). Excessiveness in this context means the award reflects injuries not proved or "a rate of compensation beyond reason." *Roach v. Keane*, 73 Wis. 2d 524, 539, 243 N.W.2d 508 (1976).

¶ 39. When a circuit court rules on a motion challenging a damage award as excessive, the court is to view the evidence in the light most favorable to the jury's verdict. *Ballard*, 33 Wis. 2d at 605 (citing *Kablitz*, 25 Wis. 2d at 525). This means that if there is any credible evidence under any reasonable view that supports the jury's finding on the amount of damages, the court is to affirm it. *See Green v. Smith & Nephew AHP, Inc.*, 2000 WI App 192, ¶¶ 31–32, 238 Wis. 2d 477, 617 N.W.2d 881 (citation omitted). With respect to awards for unliquidated damages, the supreme court has recognized that

"Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience . . . ."

*Roach*, 73 Wis. 2d at 539 (citations omitted).

¶ 40. When we review a circuit court's ruling that a verdict is not the result of perversity, we affirm unless the circuit court has erroneously exercised its discretion. *Redepenning*, 56 Wis. 2d at 134. The rationale for this deferential standard of review is that the circuit court is in a better position than an appellate court to determine whether the verdict resulted from perversity.

*Id.* When we review a circuit court's decision approving an award that is challenged as excessive based on lack of evidence to support the amount of the award, we view the jury's verdict "with particular favor" where, as here, the circuit court has analyzed the evidence in reaching its decision. *Ballard*, 33 Wis. 2d at 606. Again, the rationale for this deferential standard is that the circuit court is in a better position than the reviewing court to analyze the evidence and make an appraisal on the reasonableness of the damages. *Id.*

¶ 41. As evidence of perversity, Symons refers in general to the court's rulings that "resulted in a one-sided presentation of the evidence" and to Staskal's "misuse" of the court's rulings. To the extent Symons means the court's rulings on the OSHA report and Staskal's "misuse" of those rulings, we have already concluded the circuit court did not erroneously exercise its discretion on those points. Thus, those rulings do not make the verdict perverse. To the extent Symons is referring to other, unidentified rulings, this argument contributes nothing to the claim of perversity. Symons does refer specifically to its objection at closing argument to Staskal's counsel's reference to valuing damages for a fifty-million-dollar machine, which the court overruled. We see no error in this ruling. Counsel was not arguing that Staskal's life was a fifty-million-dollar machine, as Symons asserts. Rather, he was contrasting the ease of determining damages when such a machine no longer worked with the difficulty of valuing the loss to a human being for not being able to do things because of an injury.

¶ 42. Symons also argues that, given the evidence coupled with a comparison to other awards, the amount of the challenged awards demonstrates perversity. How-

ever, the excessiveness of an award alone generally does not suffice to support the conclusion of perversity— "except perhaps in a case where it is grossly so and readily apparent." *Redepenning*, 56 Wis. 2d at 134. Because Symons's argument on this point is anchored in its discussion of the evidence, we are not persuaded that this exception is applicable. *See id.* Accordingly, we consider next whether the amount of damages is excessive given the evidence.

¶ 43. Symons points to the evidence that Staskal can walk, can drive, has been able to get a university degree, will be able to work, and, as time has passed since the accident, has experienced improvement in his mental health and his marriage and other relationships. However, while an emphasis on this evidence might make it reasonable for a jury to award less than it did on the challenged items, it does not follow that a jury could not reasonably make the awards it did.

¶ 44. With respect to Symons's comparison of the challenged awards to the amount awarded in other unreported cases, the circuit court concluded that those cases—showing equally or more serious injuries with lower awards—were not particularly helpful, just as the cases supplied by Staskal—showing comparable or less serious injuries with equally large awards—were not particularly helpful. The court reasoned that what was important was the evidence in this case, which included evidence of not only a physical injury but also of physical and emotional pain and deterioration in the future. We can see no fault with this reasoning of the circuit court and no erroneous exercise of discretion in declining to use the cases offered by Symons to decide what was reasonable in this case. On appeal, Symons cites to *Cords v. Anderson*, 80 Wis. 2d 525, 554, 259

N.W.2d 672 (1977), as a case that did compare verdicts from other cases. A fuller description of *Cords* on this point is that, in response to cases provided by the plaintiff of awards greater than those she received, the court stated: "Comparison of verdicts from other cases is an imperfect analogy which at best only offers guidelines to a solution." *Id.* at 554 (citations omitted).

¶ 45. In short, Symons has not persuaded us that the circuit court erroneously exercised its discretion in deciding that the amount of the awards for past and future pain, suffering and disability and for loss of consortium was not the result of perversity and was supported by the evidence when viewed most favorably to the verdict. The court applied the correct legal standards to evaluate the challenged awards and explained its analysis with reference to the evidence in this case. The circuit court is in a better position than this court to decide if the challenged awards are the result of perversity, and we see nothing in Symons's arguments or the record to call into question the court's conclusion that the jury did not prejudge the matter, but made a determination based on its evaluation of the evidence.

¶ 46. Similarly, the circuit court is in a better position than this court to decide if the challenged awards are unreasonably high given the evidence when viewed most favorably to the verdict. Essentially, as the court observed, the evidence concerning Staskal's injuries, his past and future pain, suffering and disability and the impact on his wife was not disputed: in the court's words, the jury "was faced with uncontested evidence of a horrendous accident, a horrendous experience, a terribly difficult recovery, and a future with no hope of full recovery, and the only prospect being one of deterioration." The difficult task of the jury was to

arrive at dollar amounts to fully compensate for these injuries and losses. We see no basis for reversing the circuit court's conclusion that the amounts the jury arrived at are reasonable based on the evidence.

III. Punitive Damages—Sufficiency of Evidence

¶ 47. At the close of Staskal's case, Symons moved to dismiss the punitive damages claim on the ground of insufficient evidence. The court denied the motion. At the close of all evidence, the court gave the jury the following instruction from Wis JI—Civil 1707.1:[9]

> Punitive damages may be awarded, in addition to compensatory damages, if you find that the defendant acted in an intentional disregard of the rights of the plaintiff.
>
> A person acts in intentional disregard of the rights of the plaintiff if the person acts or entity acts with a purpose to disregard the plaintiffs' rights or is aware that his or that the acts are practically certain to result in the plaintiffs' rights being disregarded.

The jury answered "yes" to the verdict question: Did Symons Corporation act in an intentional disregard of the rights of the plaintiff?

¶ 48. The court denied Symons's post-verdict motion to dismiss the punitive damages claim or grant a new trial on this claim. Symons contends on appeal that the circuit court erred because the evidence on punitive damages was not sufficient to present a jury question.

¶ 49. Whether there is sufficient evidence to submit a question on punitive damages to the jury presents

---

[9] The court omitted the portions of Wis JI—Civil 1707.1 referring to malicious conduct.

541

a question of law, which we review de novo, while benefiting from the analysis of the circuit court. *Wischer*, 279 Wis. 2d 4, ¶ 32.

¶ 50. WISCONSIN STAT. § 895.85(3) provides that a "plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." While this appeal was pending, the supreme court decided *Strenke*, 279 Wis. 2d 52, ¶¶ 14, 38, in which it construed the statutory phrase "act[s] . . . in an intentional disregard of the rights of the plaintiff" to mean that "the person acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded." The court observed that this construction was consistent with the definition of the statutory phrase provided in WIS JI—CIVIL 1707.1. *Strenke*, 279 Wis. 2d 52, ¶ 37.[10] The court rejected the argument that the statutory phrase required an intent to cause injury to the plaintiff. *Id.*, ¶ 19.[11]

---

[10] The *Strenke* court explained in a footnote that in its opinion it was not using the term "practically certain" from criminal law, but instead the term "substantially certain" from civil law. *Strenke v. Hogner*, 2005 WI 25, ¶ 36 n.6, 279 Wis. 2d 52, 694 N.W.2d 296. "This change," the court stated, "does not affect the verdict in this case." *Id.* Because the court went on to cite to the definition of the statutory phrase given in WIS JI—CIVIL 1707.1, stating that it was consistent with the court's analysis, we conclude that, for purposes of this opinion, there is no significant difference between the "practically certain" term in the jury instruction and the "substantially certain" term used in *Strenke*.

[11] After *Wischer v. Mitsubishi Heavy Industries America, Inc.*, 2005 WI 26, 279 Wis. 2d 4, 694 N.W.2d 320, and *Strenke*

¶ 51. Because the instruction given the jury in this case contained the correct standard under *Strenke*, our task is to determine whether there is evidence that, if believed by the jury, is sufficient for a reasonable jury to find by clear and convincing evidence that Symons was aware that its conduct was substantially certain to result in Staskal's rights being disregarded.

¶ 52. As noted above, there was conflicting evidence over the cause of the collapse. The jury evidently believed Dr. Hill's theory—that the collapse was caused by the lack of capacity of the two-piece legs due to inadequate bracing on the legs—because it found that Symons was causally negligent and that the defective and unreasonably dangerous design of the two-piece leg system was a cause of Staskal's injuries.[12] Dr. Hill's testimony on causation was based on laboratory tests replicating the relevant physical conditions, the results of which supported his theory and undermined Dr. Corley's theory; it was consistent with the condition of the legs after the collapse; and it was consistent with the eyewitness testimony that the collapse began away from the location of the I-beam that, in Dr. Corley's opinion, caused the collapse. Dr. Hill's testimony that the two-piece legs were defectively designed and unreasonably dangerous was supported by the testimony of Thomas Walstrom, Symons's Midwest regional engineer, who is a structural engineer and was in charge of

were decided, the parties filed supplemental briefs on the applicability of these cases to this appeal. In the initial round of briefing, Symons argued that neither Walstrom nor anyone at Symons intended to injure Staskal or knew that his injury was inevitable. However, *Strenke* makes clear that is not the test. *Strenke*, 279 Wis. 2d 52, ¶¶ 19, 37.

[12] Symons does not appeal these findings by the jury.

designing this project. We conclude there was clear and convincing evidence that the cause of the collapse was the lack of capacity of the two-piece legs due to inadequate bracing on the legs and that the legs were defective and negligently designed and unreasonably dangerous.

¶ 53. The parties' debate over whether Symons was aware that use of the two-piece legs without bracing to the legs was substantially certain to result in a collapse of the forming system centers on the testimony of three witnesses: Walstrom; Edward Jelinek, Kraemer's project superintendent and an engineer; and Salvatore Pizutto, Symons's manager of field engineering.

¶ 54. Walstrom testified that he first became aware of Symons's two-piece legs on a hospital project that he supervised shortly before he supervised this project. When he realized that someone at Symons, without his knowledge, had shipped two-piece legs for the hospital project, even though the plans specified one-piece legs, he became greatly concerned about the legs buckling. In his professional opinion, the knuckle joining the two pieces introduced a "bowing" into the column and created potential problems in the load-carrying capacity of the leg; it created a lack of stability that made it unsafe; he thought the leg could collapse. He therefore designed a bracing scheme for the two-piece legs for the hospital contractor to use, placed an order to have the bracing shipped, and told Mike Nordmeyer, Symons's senior account manager and salesperson for that job, that they had to get the bracing to the contractor. Walstrom later learned that the bracing for the legs was not used on the hospital project.

¶ 55. After the hospital project was completed, Walstrom testified, he tried to get hold of Pizutto to discuss his concerns about bracing for the two-piece legs and was directed to Mike Miller, head of the shoring department. Miller told him it was Symons's policy to put on the drawing "bracing required" and the contractor was to figure out the bracing.

¶ 56. Walstrom testified that in Symons's safety manual, which states that it is for in-house use and not for customers, Symons engineers are instructed that the single-piece adjustable leg needs cross-bracing if it is going to be extended more than forty inches and have a load over 27,000 pounds, but that information is not put on the plans that go to the contractor, even for a project like this one, where the load is well over 27,000 pounds. In Walstrom's opinion, based on his experience with customers of the forming system, it is harder to sell the system if wide-based jackstands and cross-bracing in both directions are specified on the plans: this creates additional costs as well as additional labor in disassembling and moving the system.

¶ 57. With respect to the pharmacy building project, Walstrom testified that he knew the two-piece legs were not safe without bracing to carry the loads for the project. He wanted the plans that went to Kraemer to show the wide-based jackstand on every leg. However, the drafter refused to do that, even though, in Walstrom's words, he told the drafter that if the plans went out without showing the wide-based jackstands, "there will be a collapse." Symons sent out the plans to Kraemer showing the standard bases for the legs. According to Walstrom, this was not the result of an oversight, but was done intentionally. Walstrom admitted that he believed that the plans that went to Kraemer were dangerous.

545

¶ 58. Walstrom testified that, he knew when the plans went out that Kraemer would use the plans to build the system because Symons was the expert in concrete forming systems, not Kraemer, and because Kraemer was obligated to use the legs as directed in the plans. According to Walstrom, the forming system is supposed to be a complete engineered system, meaning that the entire system is fully designed and the contractor should be able to rely on the system's ability to carry the loads shown on the plans. A notice on the front of the plans states that the product "is designed with safety in mind, and is subjected to testing to be certain that it will perform as intended with appropriate safety allowances."

¶ 59. Walstrom testified that, before the first pour of the cement on the project, Darrell Kraemer and Jelinek called him to ask him whether he did not think they needed some kind of lateral bracing on the legs; although he knew they did, he said he did not know. Walstrom said this because he felt caught between the corporate policy of not specifying the safety bracing for the legs on the plans and the needs of the customer. He described the corporate policy as "just plain wrong."

¶ 60. When the system was set up for the first pour, Walstrom was asked to go the site to inspect it and he did, along with Nordmeyer. According to Walstrom, he saw that the wide-based jackstands were on the legs, and he asked Jelinek whether he was going to use them "all the way up" and Jelinek said yes. Jelinek denied that Walstrom said anything about using wide-based jackstands on the other floors. Jelinek testified that wide-based jackstands were used for the first pour to distribute the load on the dirt; Nordmeyer told him they were needed for that pour only and Symons would rent them to Kraemer for that pour, which is what

happened. Walstrom testified he did not know this at the time he inspected the site before the first pour; but he also acknowledged that he was aware at that time that the invoices he had signed off on were only for standard-base jackstands.

¶ 61. Jelinek and Walstrom both agreed that Walstrom was on the site when the third floor was being poured. According to Jelinek, it was obvious that no wide-based jackstands were being utilized and Walstrom did not make any comments. According to Walstrom, he did not inspect the legs to see if the wide-based jackstands were being used, although he acknowledged he could have.

¶ 62. When the collapse occurred, Walstrom testified, he went through a "private terror" because he knew it could have very easily been avoided had he not followed corporate policy. Symons instructed him not to disclose to anyone, including Kraemer, his opinion on why the collapse occurred. He did not give his opinion until he was deposed in this action, two years after the collapse, and he was fired two months later.

¶ 63. Pizutto acknowledged that the two-piece legs without bracing did not meet the American National Standards Institute standards mandating that systems like this must be designed to carry two-and-one-half times the expected load. He also acknowledged that, while Symons had tested the component parts of the two-piece leg, it had not tested the two-piece leg as a unit.

¶ 64. Symons argues that Walstrom did not tell his superiors about his views that the two-piece legs were not safe to use on this project but instead acted alone; and it points to Pizutto's testimony that Symons fired Walstrom when it learned from his deposition testimony that he had sent out plans he believed

547

were dangerous. However, Walstrom is a management-level employee: he is responsible for engineering and safety in the Midwest region. In addition, there was Walstrom's testimony about his conversation with Miller, the head of the shoring department, whom he was directed to contact when he could not get hold of Pizutto to tell him of the need for bracing on the two-piece legs. Finally, there is Pizutto's testimony that the two-piece legs without bracing were not safe. This evidence, together with the instructions for bracing of the single leg in Symons's engineering manual, if believed by the jury, is clear and convincing evidence that Symons knew the two-piece legs were not safe to use on this project without bracing.

¶ 65. Symons also argues that the evidence showed that Walstrom satisfied himself that Kraemer was using the necessary bracing because he provided Kraemer the calculations for longitudinal bracing, which Kraemer then made and used, and because of his visit to the site before the first pour. However, the bracing Walstrom designed for Kraemer was not, according to Walstrom's own testimony, bracing for each leg intended to solve the danger of the bowing from the knuckle on each leg. As for Walstrom's visit to the site before the first pour, the jury could believe Jelinek that Walstrom did not say anything to him about using the wide-based jackstands on the other floors. There were a number of reasons why the jury could decide Jelinek's testimony on this point was credible: Walstrom did not mention in his deposition that he spoke to Jelinek about this; according to Walstrom's own testimony he chose not to inspect to make sure the wide-base jack-stands were still being used when he went back; and there was undisputed evidence of Kraemer's initiative in making sure there was adequate bracing for various

parts of the system, which gives rise to a strong inference that, if Walstrom had suggested in any way that the wide-based jackstands should be used on all the floors, Kraemer would have done that. If the jury did not believe that Walstrom said anything to Jelinek about using the wide-based jackstands on all the floors, it could view this as evidence of his intentional disregard for the safety of Kraemer employees—given his knowledge of the dangerousness of the two-piece legs when used without bracing for the extensions and the loads planned for this project.

¶ 66. Symons points to standard notes on the plans sent to Kraemer as adequate warning that bracing on the legs was needed: two notations, "bracing as req'd by cont" with arrows pointing to the tops of two legs, and note 10 at the bottom of the page stating the need for the contractor to provide support to prevent lateral movement. However, on cross-examination, Pizutto acknowledged that the notes "bracing as req'd by cont" were directed at preventing lateral movement of the tables and trusses, as was note 10; those notes were not directed at eliminating the bowing related to the knuckle in the two-piece legs. Pizutto also acknowledged that no other notes on the plans advised the contractor of the need for that bracing. Walstrom agreed that note 10 did not tell a contractor that it needed to determine if the legs specified could carry the vertical load; and he testified that a reasonable contractor could think the "bracing as req'd by cont" notes, like note 10, referred to preventing lateral movement.

¶ 67. Given Pizutto's and Walstrom's testimony, a reasonable jury could believe that Symons knew that its plans did not inform Kraemer that it needed to provide its own bracing on the two-piece legs to make

them safe. In addition, Jelinek testified that Kraemer was not given Symons's complete engineering manual in response to its request but was eventually given cut sheets from it, which he received about two weeks before the accident. No one from Symons, he testified, drew his attention to any pages of the manual for safety reasons. There was no evidence that the pages of the engineering manual relating to bracing legs were given to Kraemer. The testimony of Dr. Hill, Jelinek, and Walstrom, if believed, establishes that contractors expect when they buy a system such as this that the plans show or explain bracing essential for safety. This evidence taken together, along with the assurance of safety testing on the plans, constitutes clear and convincing evidence that Symons knew that contractors relied on Symons to inform them of what was needed for the system to be safe and knew that it was not adequately informing Kraemer that the two-piece legs needed bracing in order to be safely used on the project.

¶ 68. We conclude there is clear and convincing evidence, if believed, that Symons was aware that its conduct was substantially certain to result in Staskal's rights being disregarded. A reasonable jury could reach this result by believing that Symons was aware that the two-piece legs it specified were dangerous if used without bracing at the extension lengths and with the loads planned for this project, and by believing that Symons nonetheless deliberately did not inform Kraemer that bracing on the legs was needed even though the plans did not specify that. Accordingly, the circuit court properly denied Symons's motion for a directed verdict on this issue and its post-verdict motions.

550

IV. Punitive Damages—Evidence of Symons's Insurance Coverage

¶ 69. In deciding the amount of punitive damages to award, juries are permitted to hear evidence of the wealth of the defendant. *City of West Allis v. Wis. Elec. Power Co.*, 2001 WI App 226, ¶ 49, 248 Wis. 2d 10, 635 N.W.2d 873. Symons has liability insurance that does not exclude coverage for punitive damages. Prior to trial, Symons moved to preclude evidence of liability insurance coverage on the ground that under *West Allis* it is not admissible to show its wealth. Staskal wanted the option of introducing that evidence on rebuttal if Symons tried to show that it could not afford to pay punitive damages. The court ruled that there "[would] be no reference to insurance for punitive damages until I make a decision that it can be referred to outside the presence of the jury." The court explained that if it came about that Symons was misleading the jury into believing that the corporation would not survive if punitive damages were awarded, it would want to consider the issue at that time. Ultimately, no evidence of Symons's insurance coverage was admitted.

¶ 70. Symons argues on appeal that the circuit court's ruling was in error because under *West Allis* its insurance coverage is not admissible for any purpose related to punitive damages and the court's conditional ruling prevented it from offering the testimony of its former comptroller, Mr. Benka, that Symons had laid off workers and had been unable to fund its pension plans for the last two years. According to Symons, this erroneous ruling prejudiced it because it was not able to rebut the evidence presented by Staskal that it earned annual profits of 7.5 million dollars.

¶ 71. We conclude that the circuit court's ruling was not erroneous under *West Allis*. In *West Allis*, we reversed a circuit court's imposition of sanctions for a defendant's inaccurate stipulation that it had no insurance for punitive damages. *Id.*, ¶¶ 44, 47, 58. We did so in part because we concluded the circuit court erred in assuming that evidence would have been admissible. *Id.*, ¶ 47. We relied on the general rule in other jurisdictions that insurance coverage is not evidence of wealth. *Id.*, ¶ 49. We did not address the admissibility of insurance coverage to rebut a defendant's testimony that a punitive damages award would cause financial ruin. The circuit court here recognized that under *West Allis* punitive damage insurance coverage is generally not admissible; it also correctly recognized that *West Allis* did not address whether there might be circumstances where it is admissible on rebuttal. The circuit court therefore properly left that question for resolution when and if it arose.

¶ 72. Symons did not subsequently ask the court for a ruling on this question, even though the topic of Benka's testifying came up. In his case-in-chief, Staskal presented evidence through a financial expert of Symons's excess revenues on an annual basis. In cross-examining Staskal's expert, Symons's counsel asked whether he knew about Symons's layoffs, distribution center closings, and pension contributions. When that expert finished testifying, Symons's counsel indicated to the court that it intended to call one more witness, a vocational rehabilitation expert, before the defense rested. After Symons's witness concluded, the court took up Staskal's argument that the cross-examination of its financial expert had suggested that Symons could not fund its pension plans, but there was no such

evidence in the record. Staskal's counsel asked for an instruction to the jury that there was no such evidence. Symons's counsel explained that Benka had been present earlier that day and was going to testify, "but, given the cross-examination of [Staskal's financial expert] we decided it was not necessary." However, Symons's counsel said, if the court was inclined to give the instruction, then Benka would be available to testify that Symons did not fund the pensions last year.

¶ 73. The court decided there was no need for a curative instruction. Symons then rested, never indicating to the court that it wanted to call Benka if the court did not give the curative instruction or that it wanted a ruling on the effect of Benka's proposed testimony on the admissibility of evidence of its insurance. The court therefore made no further ruling on the issue, and Staskal presented no evidence of Symons's insurance.

¶ 74. In order to properly preserve a claim of evidentiary error for appeal, a litigant must raise the issue in a manner that gives the circuit court opportunity to make a ruling. *State v. Kutz*, 2003 WI App 205, ¶ 27, 267 Wis. 2d 531, 671 N.W.2d 660. If a court does not make a definitive pretrial ruling on an issue raised by a party, the party must raise the issue during trial in order to preserve it for appeal. *Id.*, ¶ 30. If the party does not do so, the issue is waived and we do not address it on appeal. *Id.*, ¶ 31. Because Symons never asked the circuit court to allow it to present Benka's testimony but not allow evidence of its insurance in rebuttal, Symons has waived the issue.

## V. Punitive Damages—Amount

¶ 75. After the jury returned a verdict for $15,000,000 in punitive damages, Symons moved either for a new trial or remittitur on the ground that this award was excessive and a violation of its right to due process. The circuit court denied the motion, and Symons renews this argument on appeal.

¶ 76. The purpose of punitive damages is to punish the wrongdoer and to deter the wrongdoer and others from similar conduct. *Trinity Evangelical Lutheran Church v. Tower Ins. Co.*, 2003 WI 46, ¶ 50, 261 Wis. 2d 333, 661 N.W.2d 789. An award is excessive and therefore violates due process if it is more than necessary to serve those purposes or if it inflicts a penalty or burden on the defendant disproportionate to the wrongdoing.[13] *Id.* We review de novo whether a punitive damages award violates the due process right of the defendant. *Id.*, ¶ 48.

¶ 77. In deciding whether a punitive damages award is excessive, the court in *Trinity Evangelical* applied the three guideposts from *BMW of North*

---

[13] In *Strenke*, 279 Wis. 2d 52, ¶ 4, the court was equally divided on the question whether the punitive damages award was excessive and therefore in violation of the defendant's due process rights and so did not decide this issue. In a footnote, the court stated: "Although the certification of the court of appeals treats excessiveness and due process as separate inquiries, we view them as intertwined . . . ." *Id.*, ¶ 4 n.4. From this footnote, we understand that the challenge to a punitive damages award on the ground of excessiveness and a challenge based on the due process clause involve the same analysis. The parties both appear to agree that this is the case. We therefore analyze excessiveness and the due process guarantee as one issue.

*America, Inc. v. Gore*, 517 U.S. 559, 575 (1996), and *State Farm Mutual Auto Insurance Co. v. Campbell*, 538 U.S. 408, 409 (2003): courts are to weigh (1) the egregiousness or reprehensibility of the conduct; (2) the disparity between the harm or potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct. *Trinity Evangelical*, 261 Wis. 2d 333, ¶ 52. The *Trinity Evangelical* court also noted that

> applying a virtually identical test, Wisconsin courts have been encouraged to consider, from the following, those factors which are most relevant to the case, in order to determine whether a punitive damages award is excessive:
>
> 1. The grievousness of the acts;
>
> 2. The degree of malicious intent;
>
> 3. Whether the award bears a reasonable relationship to the award of compensatory damages;
>
> 4. The potential damage that might have been caused by the acts;
>
> 5. The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and
>
> 6. The wealth of the wrongdoer.

*Id.*, ¶ 53 (citations omitted).

¶ 78. Following the analysis of the court in *Trinity Evangelical*, we first consider whether the punitive damages award in this case accomplishes the legitimate state interests of punishment and deterrence. *Id.*, ¶¶ 54–55. We conclude that it does. The state has a

strong interest in deterring the use on construction sites of products known to be unsafe. The $15,000,000 punitive damages award against Symons will serve the legitimate state interest of deterrence, as well as in punishment.

¶ 79. We next weigh the three *BMW* guideposts and any additional relevant factors against these interests. *Trinity Evangelical*, 261 Wis. 2d 333, ¶¶ 55, 69. In doing so, we view the evidence in the light most favorable to the plaintiff and are mindful that we do not disturb the award unless the verdict is so clearly excessive as to indicate passion and prejudice. *Id.*, ¶ 56.

¶ 80. The egregiousness of the conduct is "[t]he most important indicium of the reasonableness of a punitive damages award . . . ." *Id.*, ¶ 57 (citation omitted). Specific considerations in assessing this factor are: (1) whether the harm caused was physical or economic; (2) whether the tortious conduct evinced a reckless indifference to health or safety of others; (3) whether the target was financially vulnerable; (4) whether the conduct was single and isolated or involved repeated actions; and (5) whether the harm involved was the result of intentional malice, trickery or deceit, or a mere accident. *State Farm*, 538 U.S. at 419.

¶ 81. We conclude Symons's conduct was egregious. Symons's argument that the conduct was not egregious is based on an assessment of the evidence in the light most favorable to it, not to Staskal. There is no real dispute that Symons knew the two-piece leg was not safe without bracing for use on this project, knew that the plans did not show the necessary leg bracing, and did not inform Kraemer that it was necessary. Viewing the evidence most favorably to Staskal, Symons intentionally did not supply Kraemer with information that would inform Kraemer of the need for bracing of the legs and

556

this was done because of a corporate decision that it was easier to sell the system in this way. There is no reasonable dispute on this record that Symons knew that if the two-piece legs failed, serious physical injury could result to Kraemer's employees. The financial vulnerability of the target is not relevant in this case, because the relevant harm and injury is not economic. The conduct was not isolated in that, according to Walstrom's testimony, the two-piece legs were used without adequate bracing on the hospital project; in addition, the conduct of not indicating on the plans sent to a contractor when bracing is needed to make the specified leg safe is Symons's practice; it is not an isolated instance. Finally, there was no intentional malice here, but, given the other factors we have recounted, that does not alter our conclusion that Symons's conduct was egregious.

¶ 82. The second *BMW* guidepost involves the consideration whether the compensatory damages awarded bear a reasonable relationship to the punitive damages. *Trinity Evangelical*, 261 Wis. 2d 333, ¶ 63. In this analysis, both Wisconsin law and federal law reject the concept of a fixed ratio of compensatory to punitive damages to decide what are reasonable punitive damages. *Id.* Symons argues that the compensatory damages are excessive, and reasonable compensatory damages would result in a ratio of six or seven to one, which, according to Symons is too great because the Supreme Court has stated that an award more than four times the compensatory award "might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425, citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991).

¶ 83. We have already decided that the compensatory damages are not excessive. Symons provides no case law authority for comparing the amount of puni-

tive damages to an amount less than the compensatory damages actually awarded, when the compensatory damage award has been upheld. Nor does Symons argue that $15,000,000 is unreasonable if the compensatory damage award to Staskal and his wife is upheld. In addition, we consider that the conduct here created safety hazards and caused physical injury. *See BMW*, 517 U.S. at 576 (such conduct supports higher punitive damages awards than conduct that causes economic loss only). Finally, we consider that the unsafe legs had the potential for causing fatalities and severe injuries to many people. *See Trinity Evangelical*, 261 Wis. 2d 333, ¶ 53. For these reasons, we conclude the punitive damages do not bear an unreasonable relationship to the compensatory damages.

¶ 84. As for the third *BMW* guidepost—relation to civil or criminal penalties imposed for the conduct—the parties agree that there are none. Therefore this is not a relevant factor in this case.

¶ 85. An additional relevant factor in this case is Symons's wealth. *Trinity Evangelical*, 261 Wis. 2d 333, ¶¶ 53, 69. The award approximates two years of Symons's profits. Symons argues that this is unfair because it was prevented by the court's erroneous ruling on its insurance coverage from presenting evidence of its financial situation. However, we have decided that ruling was not erroneous and that Symons waived the issues of the admissibility of Benka's testimony. Accordingly, there is nothing in the record that indicates the punitive damages award is excessive or unreasonable because of Symons's financial situation.

¶ 86. We conclude the circuit court correctly decided that the punitive damages award was not excessive and in violation of Symons's right to due process.

## VI. New Trial in the Interests of Justice

¶ 87. Under WIS. STAT. § 752.35, we have the discretion to reverse and remand for a new trial if the real controversy has not been tried or it is probable that justice has been miscarried. Symons's argument that it is entitled to a new trial on both grounds is based on claims of error that we have already rejected. Accordingly, we decline to exercise our discretionary powers of reversal.

*By the Court.*—Judgment affirmed.