COURT OF APPEALS
DECISION
DATED AND FILED

**January 7, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP110**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CV232

**IN COURT OF APPEALS
DISTRICT III**

DEETTE FANKHAUSER AND ERNEST "PAT" FANKHAUSER,

   PLAINTIFFS-RESPONDENTS,

 V.

CURTIS D. HESTAD AND ALLIED WASTE SERVICES OF
NORTH AMERICA, LLC,

   DEFENDANTS-APPELLANTS.

APPEAL from a judgment of the circuit court for Barron County: JAMES C. BABLER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Curtis Hestad and Allied Waste Services of North America, LLC, appeal a judgment, entered upon a jury's verdict, awarding damages to DeEtte and Ernest "Pat" Fankhauser for the destruction of a bridge on the Fankhausers' property. Hestad and Allied argue the circuit court erred by: (1) dismissing their counterclaims against the Fankhausers; (2) failing to direct a verdict in their favor on the Fankhausers' negligence claim; (3) failing to reduce the jury's damages award; (4) limiting Hestad and Allied's cross-examination of the Fankhausers; (5) failing to exclude the opinion of the Fankhausers' damages expert; and (6) failing to include separate questions on the special verdict for different categories of damages. We reject each of these arguments and affirm.

## BACKGROUND

¶2 The Fankhausers own a two-parcel property located on 20½ Avenue in Cumberland, Wisconsin. Pat operates a farm and a livestock hauling business on the property, and the Fankhausers also reside there. There are two entrances to the Fankhausers' property from 20½ Avenue. The west entrance is a long driveway that leads to a barn after passing in front of a modular home occupied by the Fankhausers' son, his fiancée, and the Fankhausers' grandson. The east entrance leads to the Fankhausers' residence. The west entrance can also be used to access the Fankhausers' residence, but the east entrance provides a more direct route.

¶3 Prior to November 19, 2015, in order to reach the Fankhausers' residence via the east entrance, a person was required to travel over a steel truss bridge on the Fankhausers' property that passed over the Yellow River. The bridge was constructed in 1905 and was originally part of Highway 48, which was

later rerouted. The Fankhausers purchased the parcel of property containing the bridge in approximately 1974.

¶4   Allied is a business that hauls and processes garbage. The Fankhausers were longtime customers of Allied. As early as 2005, the Fankhausers told Allied that its drivers should not use the east entrance to their property. An internal document from Allied regarding the Fankhausers' account dated September 1, 2005, contains the notation: "DON'T CROSS BRIDGE ENTER ON WE ST [sic] SIDE."

¶5   On November 19, 2015, Allied sent Hestad—one of its employees— to collect garbage along a route that included the Fankhausers' property. Hestad was an experienced driver, but he had never collected garbage from the Fankhausers' property before. He had with him a "route sheet," which provided instructions regarding the various stops along his route. The route sheet contained the following instructions regarding the Fankhausers' property: "USE WEST DRIVE-[DRIVE IN] SLOW!!!!!!!  POLES W/ WAGON WHEELS OVER DRIVE. CONTAINER SITS NEAR BARN."

¶6   After completing the stop on his route prior to the Fankhausers' property, Hestad entered the Fankhausers' address into his truck's GPS and followed the directions it provided. When Hestad reached 20½ Avenue, he did not know whether he was traveling east or west, nor did he know that there were two entrances to the Fankhausers' property. He simply saw that he had arrived at an entrance that was marked with the Fankhausers' address and had wagon wheels overhead on poles. He therefore proceeded onto the Fankhausers' property using that entrance. However, unbeknownst to Hestad, both entrances to the property were marked by poles with wagon wheels, and he had actually arrived at the

property's east entrance, rather than the west entrance specified by the route sheet. After entering the property through the east entrance, Hestad drove onto the bridge, which collapsed under the weight of his truck.

¶7 The Fankhausers subsequently filed this lawsuit against Hestad and Allied, asserting the bridge had collapsed as a result of their negligence. Hestad and Allied answered the Fankhausers' complaint and asserted counterclaims for negligence and for violation of the safe place statute. The Fankhausers then moved for summary judgment on the counterclaims, asserting the undisputed facts showed that Hestad was a trespasser on the bridge at the time it collapsed. The Fankhausers therefore argued that they did not owe Hestad a duty of ordinary care and that the safe place statute was inapplicable to him. The circuit court agreed with the Fankhausers and granted them summary judgment on the counterclaims.

¶8 The Fankhausers' negligence claim against Hestad and Allied was ultimately tried to a jury. After both sides rested, Hestad and Allied moved for a directed verdict, arguing the Fankhausers had failed to prove their damages because there had been "no testimony or other evidence in terms of a number for the value of the bridge." The circuit court denied their motion. The jury then unanimously found that both Hestad and Allied were causally negligent, and it awarded the Fankhausers $500,000 in damages.

¶9 Hestad and Allied filed motions after verdict, in which they argued that: (1) the circuit court should reduce the damages awarded by the jury, pursuant to WIS. STAT. § 805.15(6) (2017-18);[1] (2) the court should change the

_____

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

jury's damages answer to zero under WIS. STAT. § 805.14(5)(c), or should order a new trial under § 805.15(1), because there was insufficient evidence to support an award of damages; and (3) in the alternative, the court should order a new trial under § 805.15(1) based evidentiary errors. The court denied Hestad and Allied's motions after verdict and entered judgment in favor of the Fankhausers. Hestad and Allied now appeal.

## DISCUSSION

### I. Dismissal of Hestad and Allied's counterclaims

¶10 On appeal, Hestad and Allied first argue that the circuit court erred by granting the Fankhausers summary judgment on Hestad and Allied's counterclaims. We independently review a grant of summary judgment, using the same methodology as the circuit court. *Hardy v. Hoefferle*, 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

¶11 In this case, Hestad and Allied asserted counterclaims for negligence and for violation of the safe place statute. The circuit court concluded the Fankhausers were entitled to a judgment as a matter of law on those counterclaims because the undisputed facts established that Hestad was a trespasser at the time the bridge collapsed. A landowner is not ordinarily liable to trespassers "for the failure to exercise ordinary care to put his land in a safe condition." *Antoniewicz v. Reszcynski*, 70 Wis. 2d 836, 842, 236 N.W.2d 1 (1975). Instead, "in respect to a trespasser, the owner of land has only the duty to refrain from wil[l]ful and

intentional injury"—neither of which Hestad and Allied have alleged here. *See id.* In addition, the safe place statute "does not protect one who is merely a trespasser." *McNally v. Goodenough*, 5 Wis. 2d 293, 300, 92 N.W.2d 890 (1958).

¶12    Thus, the dispositive issue for purposes of the Fankhausers' summary judgment motion was whether the undisputed facts showed that Hestad was a trespasser at the time of the collapse. A "trespasser" is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." *Antoniewicz*, 70 Wis. 2d at 843 (citation omitted). Consent to enter or remain upon land may be express or implied. *See* ***Reddington v. Beefeaters Tables, Inc.***, 72 Wis. 2d 119, 124, 240 N.W.2d 363 (1976), *modified*, 72 Wis. 2d 119, 243 N.W.2d 401 (1976). Hestad and Allied do not argue that Hestad had express consent to traverse the bridge on the day of the collapse. Instead, they argue the undisputed facts show that Hestad had implied consent to do so.

¶13    We disagree. It is undisputed that the Fankhausers expressly directed Allied—as early as 2005—that its drivers should not use the bridge and should instead use the west entrance to their property. Moreover, Hestad was specifically instructed to use the west entrance on the day of the collapse. The Fankhausers' express instructions that Allied's drivers should use the west entrance and should not use the bridge are fatal to any argument that Hestad had implied permission to traverse the bridge in order to access the Fankhausers' property.

¶14    Hestad and Allied nevertheless assert multiple reasons as to why they believe Hestad had implied consent to use the bridge, none of which we find persuasive. First, although it is undisputed that the Fankhausers told Allied—

Hestad's employer—that its drivers should not use the bridge and should use the west entrance when collecting garbage from their property, Hestad and Allied assert that the Fankhausers never personally advised Hestad that he should not use the bridge. However, Hestad and Allied do not cite any legal authority supporting the proposition that the Fankhausers were required to communicate that restriction to each of Allied's drivers individually, including Hestad, rather than simply communicating the restriction to Allied itself. We need not address arguments that are unsupported by references to legal authority. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Further, this argument ignores the fact that Allied did communicate the access restriction directly to Hestad prior to his entry onto the Fankhausers' property.

¶15    Second, Hestad and Allied assert that Hestad had implied consent to use the bridge because the Fankhausers "invited him onto their property to remove their garbage." However, even though an invitee may have express or implied permission to frequent one part of a property owner's premises, he or she may still be a trespasser in another part of the premises to which he or she has not been invited. *See Monsivais v. Winzenried*, 179 Wis. 2d 758, 765 & n.4, 508 N.W.2d 620 (Ct. App. 1993); *see also McNally*, 5 Wis. 2d at 300-01. Thus, the mere fact that the Fankhausers invited Hestad onto their property to collect their garbage does not compel a conclusion that Hestad had implied consent to use the bridge under the circumstances here.

¶16    Third, Hestad and Allied contend the "only reason" the Fankhausers told Allied and other companies not to use the east entrance to their property was because their grandson was living with them at the time and they were worried about his safety. Hestad and Allied assert that was no longer the case at the time of the collapse and, as a result, the Fankhausers' reason for directing companies

not to use the east entrance no longer existed at that time. In response, the Fankhausers assert this argument is based on a "flawed understanding of the living arrangements at the Fankhausers' property."

¶17 Regardless, the argument fails because Hestad and Allied do not cite any legal authority for the proposition that the Fankhausers were required to provide a reason for the restriction they communicated to Allied in order for it to be enforceable. Moreover, Hestad and Allied cite no legal authority supporting their assertion that once the reason for the Fankhausers' restriction ceased to exist, the restriction also ceased to exist and Hestad therefore had implied consent to use the bridge. *See **Pettit***, 171 Wis. 2d at 646. In addition, there is no evidence in the record that Hestad (or any other Allied driver) was aware of the reason for the Fankhausers' restriction or knew that the reason had ceased to exist before the bridge collapsed.

¶18 Fourth, Hestad and Allied assert it was "reasonable for Hestad to believe that it was safe to drive over the bridge" because the Fankhausers "regularly drove their own commercial truck and trailer across the bridge, and they conceded that they were never concerned about whether the bridge could hold a commercial vehicle." Regardless of whether it was "reasonable" for Hestad to believe that he could safely drive over the bridge, the undisputed facts show that the Fankhausers expressly informed Allied that its drivers should not do so. Under

these circumstances, Hestad's belief about the bridge's safety is irrelevant to whether he had implied consent to traverse it.[2]

¶19 Fifth, Hestad and Allied observe that there were no markings or signs on the bridge indicating that it was not safe—or permissible—for commercial drivers to use it. They further note that the bridge "was not blocked and was open to the public." Citing *Verdoljak v. Mosinee Paper Corp.*, 192 Wis. 2d 235, 531 N.W.2d 341 (Ct. App. 1995), *aff'd*, 200 Wis. 2d 624, 547 N.W.2d 602 (1996), they argue these facts show that Hestad had implied permission to use the bridge.

¶20 *Verdoljak* does not support Hestad and Allied's position. In that case, Verdoljak was injured when he struck a closed gate while motor biking on a private logging road on land owned by Mosinee Paper Corporation. *Id.* at 237. The primary issue on appeal was whether the recreational immunity statute barred Verdoljak's negligence claim against Mosinee Paper. *Id.* at 237-38. However, as a preliminary matter—and without the benefit of briefing or argument by the parties—we addressed whether Verdoljak's claim failed for the alternative reason that he was a trespasser on Mosinee Paper's property, as a matter of law. *Id.* at 242-43. We concluded that was not the case because the facts "arguably [gave]

---

[2] In any event, our case law states that a property owner's "invitation, consent or permission may be implied … when the owner's conduct is such as would warrant a reasonable person *having knowledge thereof* to believe that the owner had given consent to come upon the premises." *Verdoljak v. Mosinee Paper Corp.*, 192 Wis. 2d 235, 243, 531 N.W.2d 341 (Ct. App. 1995), *aff'd*, 200 Wis. 2d 624, 547 N.W.2d 602 (1996) (emphasis added). Here, there is nothing in the record to indicate that Hestad knew before he attempted to traverse the bridge that the Fankhausers regularly drove their commercial truck and trailer across it and believed it could carry commercial loads. To the contrary, the record indicates that Hestad had never been to the Fankhausers' property before the day of the collapse.

rise to inferences upon which a finding could be made that [Verdoljak] was not a trespasser." *Id.* at 244. We explained:

> Mosinee granted permission to the public to enter its land for certain recreational purposes, but posted no notice of these limits. Perhaps more to the point, the gate at an undisclosed location in the interior of the property left an apparent unrestricted entry to the logging road at an intersection with a public highway. Despite Mosinee's conclusory statement that Matthew was a trespasser, the property was neither posted nor enclosed, and [Verdoljak] was never told to keep out.

*Id.* at 243-44.

¶21     *Verdoljak* is distinguishable because, unlike Mosinee Paper, the Fankhausers did not grant permission to the public to enter their land. Moreover, while Verdoljak was "never told to keep out" of Mosinee Paper's property, the Fankhausers expressly instructed Allied that its drivers should not use the bridge, and Hestad was aware that he was supposed to use the west entrance. Under these circumstances, the fact that the bridge was neither posted nor blocked does not establish, as a matter of law, that Hestad had implied consent to use the bridge.

¶22     In the alternative, Hestad and Allied argue that "[a]t a minimum," the circuit court should have concluded there was a genuine issue of material fact as to whether Hestad was a trespasser. They assert a jury could find that Hestad did not intend to trespass on the Fankhausers' property because he merely followed the directions provided by his GPS, which led him to an entrance that was marked by wagon wheels and had an address that corresponded to the one on his route sheet. They further contend that the circuit court misinterpreted *McNally* as holding that "any time an individual is invited onto property but makes a

mistaken deviation from the 'correct' path, that deviation automatically makes the individual a trespasser."

¶23    McNally was hired to perform repairs on the roof of a building rented by Goodenough. *McNally*, 5 Wis. 2d at 295-96.  McNally climbed down from the roof to ask Goodenough a question, and when making his way back to the roof, he deviated from the direct path he had previously taken and entered a vestibule, where he fell down a set of stairs. *Id.* at 296-98.  Our supreme court concluded that Goodenough was not liable under the safe place statute because McNally was a trespasser at the time of his fall. *Id.* at 300-01.  The court explained:

> When [McNally] deviated from the direct path and turned into the vestibule at the head of the stairs he became a trespasser as a matter of law and he was a trespasser when hurt on the stairway.  On no theory did [McNally] have any right to be in the vestibule or to use the stairway.  Nothing connected with his work required or justified his presence there.  He had no privilege to be there created by the Goodenoughs' consent or otherwise, and hence was a trespasser.  The fact that he did not intend to use the stairway, but was confused and did so by mistake, does not prevent its being a trespass.

*Id.* at 301 (citation omitted).

¶24    *McNally* teaches that when a person mistakenly enters into an area where he or she does not have permission to be, the mistake "does not prevent [the entry from] being a trespass." *See id.*  In this case, as in *McNally*, "[o]n no theory" did Hestad have any right to be on the bridge at the time of the collapse. *See id.*  Again, the Fankhausers had specifically told Allied that its drivers were not to use the bridge, and Hestad knew that he was supposed to use the west entrance when collecting the Fankhausers' garbage.  Thus, "[n]othing connected to

[Hestad's] work required or justified his presence" on the bridge. *See id.* Under these circumstances, even assuming that Hestad's use of the bridge was mistaken rather than intentional, that fact does not prevent us from concluding, as a matter of law, that Hestad was a trespasser.

¶25 Hestad and Allied also cite various cases in support of the proposition that Hestad was not a trespasser because he was not on the Fankhausers' property for his own purposes or convenience when the bridge collapsed but was instead there in the performance of a duty to the Fankhausers. We reject this argument because even though Hestad's presence on the Fankhausers' property *in general* was in the performance of a duty to the Fankhausers, his presence *on the bridge* was not. As noted above, Hestad's work did not require or justify his presence on the bridge. *See id.* Moreover, Hestad and Allied's argument is inconsistent with *McNally*, where our supreme court concluded as a matter of law that an individual hired to repair a roof was a trespasser when he ventured outside the areas where he needed to be in order to complete his work.

¶26 Ultimately, the undisputed facts show that the Fankhausers expressly told Allied that its drivers should not use the bridge and should instead use the west entrance to their property. It is further undisputed that Hestad knew he was supposed to use the west entrance when collecting the Fankhausers' garbage. Under these circumstances, the circuit court properly determined, as a matter of law, that Hestad was a trespasser at the time of the bridge collapse. As a result, the court properly granted the Fankhausers summary judgment on Hestad and Allied's counterclaims.

**II. Failure to grant a directed verdict in favor of Hestad and Allied**

¶27 Hestad and Allied next argue that the circuit court erred by failing to grant a directed verdict in their favor on the Fankhausers' negligence claim on the grounds that the Fankhausers failed to prove their damages. Their argument in this regard is twofold. First, they contend the court erred by holding the Fankhausers to a "reduced damages burden." Second, they argue that even if the court applied the correct damages burden, the Fankhausers failed to meet it.

¶28 As to Hestad and Allied's first argument, whether the circuit court applied the correct legal standard is a question of law that we review independently. *Republic Bank of Chicago v. Lichosyt*, 2007 WI App 150, ¶24, 303 Wis. 2d 474, 736 N.W.2d 153. Hestad and Allied argue that in order to prove their damages, the Fankhausers were required to present evidence of the bridge's market value the moment before it collapsed. They argue the court erred by concluding such evidence was not required and by instead applying the rule of damages set forth in *Town of Fifield v. State Farm Mutual Automobile Insurance Co.*, 119 Wis. 2d 220, 349 N.W.2d 684 (1984).

¶29 We agree with the Fankhausers and the circuit court that the rule set forth in *Town of Fifield* is applicable here. In that case, the Town of Fifield owned a steel truss bridge that was built in about 1905. *Id.* at 222, 224. In 1977, a truck carrying a load of forty-three tons drove over the bridge, which had a rated load limit of only four tons, and the bridge collapsed. *Id.* at 222. The town sued the trucking company and its insurer, seeking damages for the total destruction of the bridge. *Id.*

¶30 On appeal, it was undisputed that the old bridge "had no market value, in the sense that no willing buyer or willing seller, even hypothetically,

could be imagined." *Id.* at 227. Our supreme court therefore held that "[t]he usual rule of damages—the value before the occurrence as compared to the value thereafter—is not applicable, because the value before is not readily ascertainable on the basis of market value." *Id.* The court instead adopted the town's position that "the value of the bridge is the value to the owner[,] which is to be ascertained by all the factors placed before the jury, including opinion evidence, cost, use, cost of restoration, ease or likelihood of repair, continued usefulness, age of the property, and its condition." *Id.* The court further explained:

> Market value is only a method of arriving at value to the owner. The reason market value is the usual standard is that, in respect to a broad range of property, a loss can be made good by going into the open market and buying an equivalent substitute. Thus, it is always the value to the owner, to the injured party, that is the measure of damages, but market value is just one way to measure such damages.

*Id.* at 229.

¶31 *Town of Fifield* is on all fours with this case. Here, as in *Town of Fifield*, it was undisputed at trial that the Fankhausers' bridge had no market value at the time of the collapse.[3] Under these circumstances, the circuit court properly

---

[3] Hestad and Allied assert on appeal that they did not concede the bridge had no market value. However, that assertion is patently false. During a jury instruction and verdict conference on the first day of trial, the circuit court specifically asked the parties' attorneys, "Does anybody disagree that there's not a market value for a bridge?" Both attorneys then confirmed they did not disagree with that proposition. Although Hestad and Allied argue in their reply brief that they had raised an argument regarding market value "numerous times before" the jury instruction and verdict conference, they do not cite any portion of the record in which they specifically argued that the bridge had a market value before its collapse.

(continued)

determined that the damages rule set forth in *Town of Fifield* was applicable. We therefore turn to Hestad and Allied's alternative argument that, even applying the "reduced damages burden" set forth in *Town of Fifield*, the court should have directed a verdict in their favor because the Fankhausers failed to present sufficient evidence to prove their damages.

¶32 A court may grant a motion for a directed verdict challenging the sufficiency of the evidence only if it "is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." WIS. STAT. § 805.14(1). Because the circuit court is in a better position than this court to assess the weight and relevancy of the trial testimony, we give substantial deference to the circuit court's better ability to assess the evidence. *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 388-89, 541 N.W.2d 753 (1995). Consequently, we will not overturn a circuit court's decision on a motion for a directed verdict unless the record reveals that decision was "clearly wrong." *Id.* at 389 (citation omitted).

¶33 In this case, the circuit court instructed the jury as follows with respect to the Fankhausers' damages:

> Since the bridge had no market value at the time of its destruction, compensation to the owner is measured by the value of the bridge to the owner at the time of its

---

Hestad and Allied also argue on appeal that *Town of Fifield v. State Farm Mutual Automobile Insurance Co.*, 119 Wis. 2d 220, 349 N.W.2d 684 (1984), is inapplicable because the bridge in that case was public property, rather than private property. They assert *Town of Fifield*'s holding "makes sense" when confined to the context of public bridges "because placing a value on public property is difficult." This attempt to distinguish *Town of Fifield* fails because the court in that case did not base its holding on any perceived difficulty in valuing public property.

destruction. In determining the value of the bridge to the Fankhausers you should consider: the nature of the bridge, its use, age, original cost and depreciation, the cost to replace the bridge, and all other facts and circumstances received in evidence which bear on the value of the bridge to the Fankhausers.

You should not consider any sentimental value which [the] Fankhausers may have attached to the bridge.

*See* WIS JI—CIVIL 1803 (2010).

¶34 Evidence was presented at trial regarding the factors set forth in the jury instruction. As to the nature of the bridge, the jury learned that the bridge was a single-span, steel truss bridge that was positioned on concrete supports located approximately 48.5 feet apart. The overall truss width was approximately sixteen feet, which provided about fifteen feet of space between the railings. The bridge was constructed in 1905 and was originally part of Highway 48, which was later rerouted. The jury was shown photographs depicting the bridge's appearance before the collapse.

¶35 Evidence was also presented at trial regarding the Fankhausers' use of the bridge. DeEtte testified that she used the bridge on a daily basis. In contrast, she did not regularly use the west entrance to the Fankhausers' property. The Fankhausers' mailbox is located at the east entrance to their property, and before the bridge collapsed, they would typically enter their property via the east entrance, park on the bridge, and then walk to the mailbox to retrieve their mail. Since the collapse, the Fankhausers have been forced to park on 20½ Avenue when getting their mail, and they must then drive to the west entrance in order to enter their property.

¶36    The Fankhausers also testified to using the bridge for various recreational purposes.  For instance, Pat testified that he used to fish and swim off of the bridge and ice skate underneath it.  DeEtte testified that she would frequently sit on the bridge with her grandson and throw rocks into the river.  The bridge was also used as the starting line for duck and boat races during the Fankhausers' family reunions.

¶37    As for the cost of the bridge, DeEtte could not remember what she and her husband paid for the property containing the bridge, and no evidence was introduced regarding the cost to construct the bridge in 1905.  Hestad and Allied assert that the Fankhausers' failure to present any evidence regarding the cost of construction was "almost certainly a strategic decision," as that information "was presumably available as a public record" because the bridge was originally part of a public highway.  However, Hestad and Allied do not provide any support for their claim that the Fankhausers could have obtained public records regarding the bridge's cost of construction in 1905.  Moreover, if those records still exist and—as Hestad and Allied imply—are unfavorable to the Fankhausers' position, Hestad and Allied could have obtained them and introduced them at trial.  They did not do so.

¶38    In contrast, both sides introduced evidence at trial regarding the next factor listed in the jury instruction—the cost to replace the bridge.  The Fankhausers presented the expert testimony of engineer David Pantzlaff.  Pantzlaff completed two reports regarding the cost to replace the Fankhausers' bridge, both of which were discussed during his trial testimony.  The first report, dated January 29, 2016, set forth three options for replacing the bridge:  (1) a steel truss vehicle bridge, estimated to cost between $450,000 and $500,000; (2) a concrete flat slab bridge, estimated to cost between $300,000 and $350,000; and (3) a steel

truss pedestrian bridge, estimated to cost between $250,000 and $300,000. Pantzlaff discussed the differences between these options during his trial testimony and provided photographs of each alternative.

¶39  Pantzlaff's second report, dated March 23, 2016, provided an opinion as to the cost of "removing the existing bridge and building a new truss bridge similar to the existing configuration."  Specifically, Pantzlaff opined that the total cost to build such a bridge would be $575,000, which included $42,000 for removing the old bridge.

¶40  On cross-examination, Pantzlaff conceded that the target life expectancy of a highway bridge in Wisconsin is seventy-five years.  The Fankhausers' bridge was 110 years old when it collapsed.  Pantzlaff therefore conceded that, had the bridge remained part of a public road, it "would have outlived its life expectancy" prior to the collapse.  However, Pantzlaff testified the bridge had not necessarily outlived its life expectancy under the circumstances of this case, given that it "didn't get the use that a public bridge would get" and had "just been sitting there subjected to light usage."

¶41  Hestad and Allied, in turn, relied on the expert testimony of engineer Peter Quinn.  Quinn testified that given the "very little traffic" on the Fankhausers' bridge, the "most appropriate" replacement for it would be a "flat railcar bridge[]," which is a bridge type used "in a number of states to success on low-volume traffic roads."  Quinn opined that the cost to install a flat railcar bridge on the Fankhausers' property would be $142,925.  However, he conceded that estimate did not include the cost to hire a metallurgist to test the integrity of the steel used in the railcar bridge, nor did it include the cost to install railings.  Quinn also conceded that he had never been involved in the construction of a railcar bridge

and had never actually seen one in person. Quinn further testified that he did not know whether the State of Wisconsin would permit the use of a railcar bridge on private land.

¶42 Quinn testified that a new steel truss bridge could "absolutely" be built on the Fankhausers' property, but he opined that the method by which such bridges are constructed is "antiquated." He estimated it would cost $323,036 to construct a new steel truss bridge, but he conceded that amount did not include any costs for engineering, salvage, or demolition. He also conceded that Pantzlaff's estimated cost of $575,000 for a new steel truss bridge was reasonable.

¶43 In addition to the factors discussed above, the jury instruction on damages also directed the jurors to consider "all other facts and circumstances received in evidence which bear on the value of the bridge to the Fankhausers." Evidence was introduced at trial that without the bridge, the parcel of land containing the Fankhausers' residence is landlocked—i.e., it has no access to a public road. Thus, if the Fankhausers want to sell that parcel separately from their western parcel, the new owner will either have to obtain an easement or replace the destroyed bridge. DeEtte also testified that because she and Pat must now use the driveway that passes their son's residence, they have less privacy than they did before the bridge collapsed. Both of these considerations are relevant to determining the bridge's value to the Fankhausers.

¶44 As the above summary demonstrates, evidence was introduced at trial regarding nearly all of the factors listed in the jury instruction on damages. That evidence was sufficient for the jury to make a determination regarding the precollapse value of the Fankhausers' bridge. Although damages may not be determined "by mere speculation or guess, it will be enough if the evidence

show[s] the extent of the damages as a matter of just and reasonable inference." ***Town of Fifield***, 119 Wis. 2d at 230-31 (citation omitted). Thus, on the record before us, we cannot conclude that the circuit court's decision to deny Hestad and Allied's motion for a directed verdict was "clearly wrong." ***Weiss***, 197 Wis. 2d at 389 (citation omitted).

### III.  Failure to reduce the jury's damage award

¶45    Hestad and Allied next argue that the jury's award of $500,000 in damages is excessive, and the circuit court should have granted their motion to reduce the award under WIS. STAT. § 805.15(6).  An award of damages is excessive under § 805.15(6) when it "reflects injuries not proved or 'a rate of compensation beyond reason.'" ***Staskal v. Symons Corp.***, 2005 WI App 216, ¶38, 287 Wis. 2d 511, 706 N.W.2d 311 (citation omitted).  When considering a motion to reduce a damages award under § 805.15(6), a circuit court must view the evidence in the light most favorable to the jury's verdict.  ***Staskal***, 287 Wis. 2d 511, ¶39.  Thus, the court must affirm the award "if there is any credible evidence under any reasonable view that supports the jury's finding on the amount of damages."  ***Id.***  On appeal, "we view the jury's verdict 'with particular favor' where, as here, the circuit court has analyzed the evidence in reaching its decision." ***Id.***, ¶40 (citation omitted).

¶46    In this case, we agree with the circuit court that there was credible evidence to support the jury's award of $500,000 in damages.  As summarized above, evidence was introduced at trial regarding the factors set forth in WIS JI—CIVIL 1803 (2010).  That evidence included Pantzlaff's opinion that it would cost $575,000 to replace the bridge with a new steel truss bridge, as well as Quinn's concession that Pantzlaff's cost estimate was reasonable.  The jury could also

consider Pantzlaff's testimony that although the target life expectancy of a highway bridge in Wisconsin is seventy-five years, the same is not necessarily true for a private bridge that is subjected to only "light usage."

¶47    In addition, evidence was introduced at trial regarding the Fankhausers' use of the bridge both to access their property and for recreational purposes. Moreover, there was evidence that if the Fankhausers ever sold the parcel where their residence is located, that parcel would be landlocked without a bridge. DeEtte also testified that she and Pat have less privacy than they did before the bridge collapsed because they must now use the driveway that passes their son's residence. Taken together, this evidence supported the jury's determination that the bridge's value to the Fankhausers before its collapse was $500,000.

¶48    Hestad and Allied argue no reasonable jury "could have found that a 110[-]year-old private bridge, with no record of maintenance, was worth $500,000 the moment before it collapsed." They therefore contend that the only "rational explanation" for the jury's damages award is that the jury either: (1) impermissibly awarded the Fankhausers the replacement cost of the bridge; or (2) impermissibly awarded the Fankhausers damages for the bridge's sentimental value.

¶49    As to Hestad and Allied's first argument, we observe that the jury was permitted to consider the replacement cost of the bridge when determining the amount of the Fankhausers' damages. *See* WIS JI—CIVIL 1803 (2010). Moreover, the jury ultimately awarded a sum that was less than the $575,000 figure that both experts agreed was a reasonable estimate of the cost to install a new steel truss

bridge. That fact undercuts Hestad and Allied's claim that the jury merely awarded the Fankhausers the bridge's replacement cost.

¶50    Turning to Hestad and Allied's second argument, the jury was expressly instructed that when awarding damages, it was not to consider any sentimental value that the Fankhausers attached to the bridge. *See id.* We presume that jurors follow the court's instructions. **State v. Truax**, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989). To the extent Hestad and Allied intend to argue that the Fankhausers' attorney improperly invoked the bridge's sentimental value during his closing argument, we observe that Hestad and Allied did not object to those remarks. "Improper remarks in closing arguments cannot be a basis for a motion for a new trial or a basis for an appeal … if no timely objection to the argument was made." **Hubbard v. Mathis**, 53 Wis. 2d 306, 307, 193 N.W.2d 15 (1972). Because Hestad and Allied failed to object to any allegedly improper remarks during the Fankhausers' closing argument, we decline to consider their argument that those remarks improperly influenced the jury's damages award.

## IV. Failure to allow cross-examination of the Fankhausers regarding the bridge's precollapse condition and maintenance

¶51    Hestad and Allied also argue that the circuit court erred by prohibiting them from cross-examining the Fankhausers regarding the bridge's precollapse condition and maintenance. A circuit court has discretion to restrict cross-examination, and we will not reverse based on the court's decision to do so unless the court erroneously exercised its discretion and the error "affected a substantial right of the complaining party and probably affected the result of the trial." **Neider v. Spoehr**, 41 Wis. 2d 610, 618, 165 N.W.2d 171 (1969).

¶52 During Hestad and Allied's cross-examination of DeEtte, the circuit court sustained an objection when counsel asked whether DeEtte knew "when there was any maintenance last done on this bridge." The jury was then excused, and counsel for Hestad and Allied argued that whether the Fankhausers had maintained the bridge was relevant to determining the bridge's value. He explained:

> I would liken this to an automobile. Somebody has a destroyed automobile and the jury is supposed to put a value on it, but the oil has never been changed in ten years. That would certainly be relevant to explain the condition of the vehicle, what it's worth. It's a similar situation here.

¶53 Counsel for the Fankhausers responded that evidence regarding their maintenance of the bridge instead went to "the negligence or the responsibility on the part of the plaintiff[s]. … If the jury hears that … there hasn't been any maintenance on it, then they're going to speculate as to, all right, what really caused this bridge collapse?" Counsel further argued there had been no expert testimony "that this bridge collapsed because it was poorly maintained."

¶54 After reviewing the jury instruction on damages, the circuit court agreed with the Fankhausers, explaining:

> I'm going to sustain the objection. I think [the question regarding maintenance] asks the jurors to speculate on issues of causation rather than value.
>
> If it was … if the issue was that it was in poor repair and they knew it and didn't fix it, that's an issue because that goes to value. But maintenance alone has more than one connotation. I think it requires the speculation.

When the jury returned, counsel for Hestad and Allied asked DeEtte whether the Fankhausers had ever hired a professional to inspect the bridge, and the court sustained the Fankhausers' objection to that question.

¶55   We conclude the circuit court did not erroneously exercise its discretion by preventing Hestad and Allied from questioning DeEtte about the Fankhausers' maintenance and inspection of the bridge.   Hestad and Allied's questions about those topics went, at least in part, to the issue of whether the Fankhausers were responsible for the bridge's collapse because they had failed to properly maintain or inspect it.   However, as the Fankhausers' attorney pointed out, there was no expert testimony at trial that the bridge collapsed because it was poorly maintained.   Moreover, the jury was not asked to determine whether the bridge's collapse was caused in part by the Fankhausers' negligence.   Instead, the special verdict asked the jurors to determine only whether Hestad and Allied were causally negligent.   As such, the issue of the Fankhausers' responsibility for the collapse would likely have confused the jury.   Under these circumstances, the court did not erroneously exercise its discretion by limiting Hestad and Allied's cross-examination of DeEtte.   *See* WIS. STAT. § 904.03 (relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of … confusion of the issues").

¶56   Later on, during Pat's testimony, the circuit court sustained the Fankhausers' objections when counsel for Hestad and Allied asked: (1) whether Pat had ever known the bridge's capacity; (2) whether he ever had concerns about the safety of the bridge or about driving his truck and trailer over it; and (3) if he knew before the collapse whether the bridge could hold a truck.   The court did not erroneously exercise its discretion by sustaining the Fankhausers' objections to these questions.   Again, the questions appear designed to suggest that the bridge was unsafe and that the Fankhausers were therefore responsible for its collapse.   As explained above, the Fankhausers' potential responsibility for the collapse was not an issue before the jury, and evidence regarding Pat's beliefs about the

bridge's capacity, safety, and ability to hold a truck would therefore likely have confused the issues.

¶57    In addition, even if the circuit court erred by limiting Hestad and Allied's cross-examination of the Fankhausers, to obtain relief on that basis Hestad and Allied must demonstrate that the alleged error affected their substantial rights and probably affected the result of the trial.  *See **Neider***, 41 Wis. 2d at 618.  They have not made this showing.  The record is devoid of any evidence suggesting that the bridge was in a poor condition prior to the collapse.  Hestad and Allied did not introduce any expert testimony to that effect, nor did they present an offer of proof supporting their theory regarding the poor condition of the bridge.  Moreover, Hestad and Allied's attorney conceded at trial that the Fankhausers had testified the bridge "was in good condition.  It was solid.  … [T]here was nothing wrong that they could see with it."  On these facts, we cannot conclude that the court's limitation of Hestad and Allied's cross-examination of the Fankhausers affected Hestad and Allied's substantial rights or the result of the trial.

## V.  Failure to exclude the opinion of the Fankhausers' damages expert

¶58    Hestad and Allied next argue that the circuit court erred by failing to exclude Pantzlaff's opinion that it would cost $575,000 to replace the bridge with a similar steel truss bridge.  The admission of expert testimony is governed by WIS. STAT. § 907.02(1), which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods,

and the witness has applied the principles and methods reliably to the facts of the case.

Whether to admit expert testimony rests within the circuit court's discretion. *State v. Pico*, 2018 WI 66, ¶15, 382 Wis. 2d 273, 914 N.W.2d 95.

¶59 Hestad and Allied argue the circuit court erred by admitting Pantzlaff's opinion as to the replacement cost of the bridge because his opinion was not "the product of reliable principles and methods."[4] *See* WIS. STAT. § 907.02(1). They note that during his deposition, Pantzlaff testified that in order to estimate the bridge's replacement cost, he "visited the site to collect some data in regard to the existing length and width" and to "view the previous structure that was collapsed." Then, based on his experience designing bridges, he "estimated what a new bridge carrying legal loads would entail."

¶60 Pantzlaff conceded during his deposition that he did not perform the more complex process that he uses when designing a bridge for actual construction. He explained that process entails: (1) completing a field survey— i.e., drawing a map of the area's topography; (2) completing a hydraulic analysis for review by regulatory agencies such as the Wisconsin Department of Natural Resources; (3) drawing a conceptual or preliminary plan for review by the appropriate regulatory agencies and by the property owner; (4) preparing final

---

[4] Hestad and Allied do not dispute that Pantzlaff was qualified to offer an opinion regarding the replacement cost of the bridge. Any argument to that effect would have been meritless, as the record shows that Pantzlaff was employed as a bridge engineer at the Iowa Department of Transportation from 1973 to 1978; obtained a master's degree in structural engineering in 1977; and had been employed at a private engineering firm since 1978 as a "project engineer and manager for various bridge projects." Moreover, Pantzlaff testified at trial that he had participated in the engineering process for approximately 1000 bridges over the course of his career.

plans and specifications; (5) writing specifications to modify the standard specifications set forth by the Wisconsin Department of Transportation (DOT); (6) advertising the project to contractors and accepting bids to construct the bridge; (7) evaluating the bids; and (8) overseeing the selected contractor's construction of the bridge.

¶61    Hestad and Allied contend that Pantzlaff's methods in this case were not reliable because he conceded he did not perform all of the steps outlined in the previous paragraph when formulating his opinion as to the replacement cost of the Fankhausers' bridge.  However, Hestad and Allied do not explain why it was necessary for Pantzlaff to perform those steps here, where he was merely estimating replacement cost, rather than designing a bridge for actual construction. Moreover, Pantzlaff testified at trial that his usual process when estimating the cost to replace a bridge is to: (1) visit the site and collect data regarding the bridge's span and height; (2) consult maps and hydraulic data "to get a sense for what size structure is appropriate at the site"; and (3) calculate a bid estimate after computing the quantities of materials needed and consulting the DOT's database "for bid tabulations for previous similar projects in this geographic area." Pantzlaff testified that he followed this process when estimating the cost to replace the Fankhausers' bridge.

¶62    On this record, we cannot conclude the circuit court erroneously exercised its discretion when it rejected Hestad and Allied's argument that Pantzlaff's methods were unreliable.  As the court aptly noted, the jury could consider Hestad and Allied's criticisms of Pantzlaff's methods when deciding whether to accept his opinion regarding the cost to replace the bridge.  Those criticisms did not, however, render Pantzlaff's testimony inadmissible.

## VI. Failure to include separate questions on the special verdict for different categories of damages

¶63 Finally, Hestad and Allied argue that the circuit court erred by failing to include separate questions on the special verdict for different categories of damages. A circuit court has wide discretion in determining the words and form of a special verdict, and we will not reverse unless the court erroneously exercised its discretion. *Gumz v. Northern States Power Co.*, 2007 WI 135, ¶23, 305 Wis. 2d 263, 742 N.W.2d 271. "A court erroneously exercises its discretion if the special verdict questions fail to cover all issues of fact or are inconsistent with the law." *Id.*, ¶24.

¶64 The special verdict in this case contained a single question regarding damages: "What amount will reasonably compensate Plaintiffs for the destruction of their bridge as a result of the November 19, 2015, bridge collapse?" Hestad and Allied assert that "[w]hen a party is seeking several categories of damages, the verdict should separate the damages out by category so that the opposing party and the circuit court can determine whether the respective damage awards were supported by admissible and credible evidence." They therefore argue the circuit court should have included separate questions on the special verdict for the two categories of damages the Fankhausers sought in this case: (1) the bridge's precollapse value; and (2) the cost to remove the collapsed bridge.

¶65 The problem with Hestad and Allied's argument is that the legal authority they rely on does not support it. Citing *Koele v. Radue*, 81 Wis. 2d 583, 588, 260 N.W.2d 766 (1978), Hestad and Allied argue that juries in personal injury cases "routinely answer separate verdict questions for different categories of damages, such as past and future medical expenses, past and future lost wages, and pain and suffering." However, *Koele* is merely one example of a personal injury

case in which the special verdict included separate questions for different categories of damages. ***Koele*** does not stand for the proposition that such separation is required in all cases.

¶66    Hestad and Allied also argue that the circuit court was required to include separate damages questions on the special verdict because our supreme court "approved" the special verdict used in ***Town of Fifield***, which included separate damages questions. This argument fails for two reasons. First, while the special verdict in ***Town of Fifield*** contained two damages questions, the second question included multiple categories of damages—namely, the cost to remove wreckage, expenses incurred in providing a detour, and the cost of a temporary bridge. ***Town of Fifield***, 119 Wis. 2d at 222-23. Thus, ***Town of Fifield*** did not involve a special verdict that contained separate questions for each category of damages. Second, the supreme court did not actually "approve" the special verdict used in ***Town of Fifield***. Rather, no issue regarding the form of the special verdict was raised on appeal, so the court did not address it.

¶67    Hestad and Allied's failure to cite any supporting legal authority is fatal to their argument that the circuit court was required to include separate damages questions on the special verdict. *See **Pettit***, 171 Wis. 2d at 646. We therefore reject their claim that the court erroneously exercised its discretion by failing to do so.

> *By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.